Ira G. Greenberg (IG-6156)
EDWARDS WILDMAN PALMER LLP
750 Lexington Avenue, 8th Floor
New York, NY 10022
(212) 308-4411
igreenberg@edwardswildman.com

**FILED**
IN CLERK'S OFFICE
U S DISTRICT COURT E.D.N.Y.
★ MAY - 7 2012 ★

BROOKLYN OFFICE

Todd A. Noteboom (subject to *pro hac vice* admission)
Monica L. Davies (subject to *pro hac vice* admission)
LEONARD, STREET AND DEINARD
  Professional Association
150 South Fifth Street, Suite 2300
Minneapolis, MN 55402
(612) 335-1500
todd.noteboom@leonard.com
monica.davies@leonard.com

**ROSS, J.**

**POLLAK, M.J**

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY,

             Plaintiff,

      vs.

SUPERIOR MEDICAL REHAB, P.C., and
SIMA ANAND, M.D.,

             Defendants.

---

**CV 12 - 2234**
No.:

COMPLAINT

Plaintiff State Farm Mutual Automobile Insurance Company ("State Farm"), as and for

its Complaint against Defendants Superior Medical Rehab, P.C. ("Superior Medical") and Sima

Anand, M.D. (collectively referred to as "Defendants"), hereby states and alleges as follows:

## **INTRODUCTION**

1.    Since September 2007, Defendants have engaged in a practice of wrongfully obtaining funds from State Farm by submitting, and causing to be submitted, fraudulent bills in the name of Superior Medical and/or Dr. Anand, arising from or relating to various medical services allegedly provided to individuals who were involved in automobile accidents and eligible for insurance coverage under State Farm insurance policies.

2.    The medical services for which Defendants have improperly billed State Farm include, but are not limited to, (1) initial and follow-up examinations ("Examinations"), (2) electromyography tests ("EMGs"), (3) nerve conduction velocity tests ("NCVs"), (4) sympathetic nerve block injections ("Nerve Blocks"), and (6) physical therapy ("PT") (collectively referred to as "Fraudulent Services").

3.    Defendants are not entitled to payment from State Farm for the Fraudulent Services identified, because such services were not medically necessary, were performed pursuant to pre-determined fraudulent protocols designed to enrich Defendants unjustly, and/or were billed in such a way that the charges misrepresented and exaggerated the level of services provided.

4.    To date, Defendants have obtained approximately $157,000 as a result of their fraudulent and unlawful practices. In addition, Defendants have billed State Farm for more than $600,000 to which they are not entitled due, at least in part, to their failure to appear for duly noticed and scheduled examinations under oath ("EUOs") requested by State Farm, which constitutes a failure by Superior to satisfy a condition precedent to coverage and violates its obligations under New York "No-Fault" insurance regulations. Through this action, State Farm

seeks to recover all funds paid to Defendants and further seeks a declaration that it is under no obligation to pay any of the outstanding invoices Defendants have submitted.

## THE PARTIES

5.      State Farm is a mutual insurance company domiciled in Illinois, with its principal place of business in Illinois.

6.      Superior Medical is a New York professional service corporation with its principal place of business in New York. Superior Medical was incorporated in New York on or about September 17, 2007.

7.      Dr. Anand is a physiatrist who has been licensed to practice medicine in New York since 2000. Dr. Anand resides in and is a citizen of New York, and is the record owner of Superior Medical.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over the subject matter of this action, pursuant to 28 U.S.C. § 1332(a)(1), as this matter is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9.      Venue is proper in this district, pursuant to 28 U.S.C. § 1391, as this is the district where a substantial part of the events or omissions giving rise to State Farm's claims occurred and both Defendants are subject to personal jurisdiction here.

## FACTUAL ALLEGATIONS

## I.      OVERVIEW OF NO-FAULT LAWS AND LICENSING STATUTES

10.     State Farm underwrites automobile insurance in the State of New York.

11.     New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services

necessary to treat their injuries. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to insureds.

12.     No-Fault Benefits include up to $50,000 per insured for necessary expenses that are incurred for healthcare goods and services.

13.     An insured can assign his or her right to No-Fault Benefits to health care service providers in exchange for medical services. Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or more commonly as an "NF-3"). In the alternative, healthcare providers sometimes submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form"). Once the healthcare provider takes an assignment of an insured's rights, the provider cannot seek to recover payment from the Insured.

14.     Health care providers that seek to collect No Fault benefits from New York automobile insurers must be in compliance with all applicable New York licensing laws. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12), provides, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York ....

15.     Based on 11 N.Y.C.R.R. § 65-3.16(a)(12), the New York Court of Appeals, in *State Farm Mut. Auto. Ins. Co. v. Mallela*, 4 N.Y.3d 313, 320 (2005), made it clear that professional corporations that fail to comply with licensing requirements are ineligible to collect no-fault benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law, for instance by engaging in the corporate practice of medicine. Likewise, N.Y. Bus. Corp. Law § 1507 requires that a physician shareholder of a medical professional corporation must be engaged in the practice of medicine through the professional corporation for it to be lawfully licensed. *See also Matter of Andrew Carothers M.D. P.C.*, 26 Misc. 3d 448, 460 (N.Y. Civ. Ct. 2009); 87 NY Jur Professional Service Corporations § 7.

16.     Accordingly, pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or collect No-Fault Benefits if they are "fraudulently incorporated" and/or not truly owned or controlled by a licensed physician. In New York, only a licensed physician may:

(a)     practice medicine;

(b)     own or control a professional corporation authorized to practice medicine;

(c)     employ or supervise other physicians;

(d)     absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

17.     Further, pursuant to the No-Fault Laws, health care service providers are not eligible to receive No-Fault Benefits if they engage in fee-splitting, which is prohibited by, *inter alia*, New York's Education Law.

18.     Additionally, New York law requires that the shareholders of a medical professional corporation be engaged in the practice of medicine through the professional corporation in order for it to be lawfully licensed. Under the No-Fault Laws, professional

corporations are not eligible to receive No-Fault Benefits if they are owned by physicians who do not engage in the practice of medicine through the professional corporation.

19.   Pursuant to the No-Fault Laws, only health care service providers in possession of a direct assignment of benefits are entitled to bill for or collect No-Fault Benefits. There is both a statutory and a regulatory prohibition against payment of No-Fault Benefits directly to anyone other than the patient or his/her healthcare provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, provides, in pertinent part, as follows:

> An insurer shall pay benefits for any element of loss .... *directly* to the applicant or, ... upon assignment by the applicant .... shall pay benefits *directly* to providers of health care services as covered under section five thousand one hundred two (a)(1) of the Insurance Law.... . (emphasis added).

20.   Thus, for a healthcare provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to N.Y. Ins. Law § 5102(a), it must be the actual provider of the service. Under the No-Fault Laws, a professional service corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who are not employees of the professional corporation, such as independent contractors.

21.   Finally, pursuant to N.Y. Ins. Law § 403, all bills submitted by a healthcare provider to State Farm and all other insurers must be verified by the healthcare provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime ....

## II.    OVERVIEW OF REGULATIONS PERTAINING TO VERIFICATION OF NO-FAULT CLAIMS

22.    The No-Fault Laws require individuals and healthcare providers that seek payment of No-Fault Benefits to provide insurers with additional verification in order to establish proof of their claims.

23.    The prescribed No-Fault policy endorsement set forth in 11 N.Y.C.R.R. § 65-1.1 includes a specific section entitled "Conditions," which states, in pertinent part, that "upon request by the Company, the eligible injured person or that person's assignee . . . shall (b) as may reasonably be required, submit to an examination under oath by any person named by the Company, and shall subscribe to same . . . , and (d) provide any other pertinent information that may assist the Company in determining the amount that is payable."

24.    The prescribed No-Fault policy endorsement set forth in 11 N.Y.C.R.R. § 65-1.1 also states that "No action shall lie against the Company, unless, as a condition precedent thereto, there shall have been full compliance with the terms of this coverage."

25.    The proof of claim requirement in the No-Fault policy endorsement, 11 N.Y.C.R.R. § 65-3.5(b) states in relevant part:

> Subsequent to the receipt of one or more of the completed verification forms, any additional verification required by the insurer to establish proof of claim shall be requested within 15 business days of receipt of the prescribed verification forms.
>
> Any requests by an insurer for additional verification need not be made on any prescribed or particular form . . .

26.    Additionally, 11 N.Y.C.R.R. § 65-3.5(c) states in relevant part:

> The insurer is entitled to receive all items necessary to verify the claim directly from the parties from whom such verification was requested.

27.     An insurer is entitled to any information, as additional verification, that is necessary for the insurer to determine whether the claim submitted by the healthcare provider is payable. The issues for which additional verification are properly sought are not limited, and may include, for example:

> (a)     whether the services provided by the healthcare provider were rendered and/or medically necessary;
>
> (b)     whether the services were provided by persons not employed by the healthcare provider thus rendering the professional corporation ineligible pursuant to 11 NYCRR §65-3.11(a); and
>
> (c)     whether the professional corporation is ineligible for benefits pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) because it was fraudulently incorporated and owned and controlled by persons other than a licensed physician.

28.     Under 11 N.Y.C.R.R. § 65-3.5(b), upon receipt of a bill, an insurer has 15 business days to issue a verification request, including a request for an EUO. Upon a party's failure to provide such verification, an insurer has 10 calendar days to contact the party from whom verification has been requested and not been provided, at which time the EUO is re-scheduled.

29.     Pursuant to 11 N.Y.C.R.R. § 65-3.5(e), "when an insurer requires an examination under oath of an applicant to establish proof of claim, such requirement must be based upon the application of objective standards so that there is specific objective justification supporting the use of such examination. Insurer standards shall be available to the [Insurance] Department examiners."

30.     The Insurance Department has confirmed that insurers are not obligated to provide the objective standards for review by a claimant or claimant's attorney when an EUO

has been requested. Rather, insurers are required to maintain the objective standards for

Insurance Department review only.

31.     Because an EUO is a condition of coverage, an insurer may deny a healthcare

provider's or individual's claim for No-Fault Benefits if the healthcare provider or individual

claimant refuses to appear for an EUO, which constitutes a material breach of the insurance

policy and/or a violation of the applicable regulations. This is confirmed by the New York State

Department of Insurance in an opinion letter, dated December 22, 2006 which states:

> As referenced above in Section 65-1.1(d), the prescribed No-Fault
> endorsement requires that, as a condition to coverage, an eligible
> injured person or that person's assignee shall "…as may be
> reasonably required, submit to examinations under oath by any
> person named by the Company…"
>
> ***
>
> When an EUO is required and the party required to appear fails to
> attend a scheduled EUO, the insurer must meet its obligations
> under N.Y. Comp Codes R. & Regs. tit 11, §65-3.6(b) and within
> 10 calendar days, contact the party from whom verification (the
> EUO) has been requested and not provided, i.e., non-attendance at
> the scheduled EUO, in order to afford the party a second
> opportunity to attend an EUO. If the party fails to appear at the
> rescheduled EUO, an insurer may issue a denial of pending claims
> based upon the failure to meet the condition for coverage in not
> submitting to the requested EUO, as required under the prescribed
> endorsement. There is no requirement in the regulation that the
> denial must state the specific reason(s) why the insurer required the
> EUO.

## III.     DEFENDANTS' FRAUDULENT INCORPORATION, BILLING AND TREATMENT SCHEMES

### A.     DEFENDANTS' FRAUDULENT INCORPORATION

32.     Superior Medical is purportedly owned by Dr. Anand and was incorporated on or

about September 17, 2007. Superior Medical initially began operating out of a clinic located at

3857 Kings Highway, Brooklyn, New York, after an entity known as Universal Medical PC

("Universal Medical") closed its operations there. Superior Medical billed from that location

from September 2007 until approximately January 2008, at which time Superior Medical began billing from the same address as All Family Medical, PC ("All Family Medical"), an affiliate of Universal Medical, located at 87-36 Jamaica Avenue, Richmond Hill, New York. Superior Medical subsequently began billing from 35-50 92nd Street, Jackson Heights, New York.

33.     In addition to being the purported owner of Superior Medical, Dr. Anand has billed State Farm for health services allegedly rendered at numerous other facilities, including 1705 New York Avenue, Huntington Station, New York, where Dr. Anand issued bills using her own social security number. Moreover, Dr. Anand has previously submitted bills to State Farm from the following addresses:

(a)     87-36 Jamaica Avenue, Richmond Hill, New York, 1890

(b)     1890 New York Ave, Huntington Station, New York;

(c)     95 Clinton Street, Hempstead, New York

(d)     388 Fulton Street, Hempstead, New York.

34.     Upon information and belief, Dr. Anand is one of a number of doctors that appear to have been used as a revolving door of "paper owners" of medical PCs operating out of the former Universal Medical clinic located in Brooklyn and the All Family Medical clinic located in Richmond Hill.

35.     Dr. Anand has previously appeared as a physician billing under the All Family Medical name (allegedly owned by Dr. Manuel Farescal) at All Family Medical's location on Jamaica Avenue in Richmond Hill, New York. Both All Family Medical and Dr. Farescal are defendants in a litigation currently pending in New York Supreme Court, Queens County, in which State Farm has developed substantial evidence that All Family Medical (and other medical professional corporations) were fraudulently incorporated in the name of Dr. Farescal.

36.    Dr. Anand has also billed under the Superior Medical name from the former Universal Medical clinic (also allegedly owned by Dr. Farescal), located in Brooklyn, New York. Billing from this Brooklyn location was previously submitted to State Farm under the Universal Medical name, with Dr. Farescal listed as the owner.

37.    When Dr. Anand and Superior Medical stopped billing from the Brooklyn location, Universal Medical's sister company, All Family Medical (also owned by Dr. Farescal) began billing from this location. State Farm has since begun receiving bills from the same Brooklyn location in the name of yet another entity, General Medical PC.

38.    Moreover, upon information and belief, Universal Medical and All Family Medical were illegally controlled by two non-physicians, Adnan Munawar and Sheryar A. Chaudhry. Munawar previously acted as the "administrator" of Universal Medical and All Family Medical and, in that capacity, siphoned off hundreds of thousands of dollars from medical PCs. Chaudhry also siphoned off funds from the medical PCs using an outside company to provide fictitious marketing services.

39.    State Farm previously commenced litigation against Universal Medical and All Family Medical in New York Supreme Court, Queens County, which litigation is currently pending. After that litigation was commenced, Munawar left his position as "administrator" of All Family Medical and Universal Medical and Chaudhry closed his marketing company. Munawar and Chaudhry then established a purported billing company known as AMSAC to conceal their illegal control over, and illegal splitting of the profits of, Universal Medical and All Family. Upon information and belief, AMSAC is named for Munawar and Chaudhry and is an acronym of their names.

40.     Superior Medical and Dr. Anand are also associated with AMSAC. Despite repeated changes in "ownership," the medical reports, treatment patterns, and employees appear to be consistent throughout. For example, when Dr. Anand and Superior Medical operated out of the Brooklyn clinic, Superior Medical billed for physical therapy services by the same therapist (Julius Tiu) who had previously appeared under the Universal Medical name, and who now works under the name of General Medical PC. Similarly, Nerve Block reports for Superior Medical, All Family and General Medical are essentially identical.

41.     State Farm's investigation has further revealed that Superior Medical shared its telephone number with a number of different entities over the years, and has been associated with various billing companies, including AMSAC.

**B.      DEFENDANTS' FRAUDULENT TREATMENT SCHEME**

42.     Dr. Anand and Superior Medical have perpetrated a fraudulent scheme with respect to patient treatment, which includes, without limitation, the performance of and billing for excessive and medically unnecessary Examinations, EDX Tests, PT and Nerve Blocks according to pre-determined, cookie-cutter procedures. Defendants created such fraudulent procedures for their own financial benefit, without regard to patient safety or medical necessity.

**1.      Fraudulent, Cookie-Cutter Examinations**

43.     Defendants regularly bill State Farm for Examinations (also known as office consultations), including initial and follow up examinations. The result of the Examinations are pre-determined and essentially identical for every insured in that Superior's examination reports, whether initial reports or follow up reports, regularly found the patient to have a "marked disability" of 75%-99%, even where the patients had gone back to work.

44.     Based upon their pre-determined procedures, Superior Medical and Dr. Anand

(operating both through Superior Medical and on her own and/or through other entities) purport

to order, perform and/or interpret PT, Nerve Blocks, and EDX Testing for virtually every

Insured, regardless of whether these services or procedures were medically necessary.

45.     A sampling of Dr. Anand's examination reports, for both initial and follow up

examinations, reveals that Dr. Anand routinely makes virtually identical findings and

recommendations for each Insured. This is true regardless of the length of time that has elapsed

since the injury, and regardless of the Insured's age, symptoms and/or whether the Insured has

returned to work.

### a.  Examinations Conducted by Dr. Anand Through Superior Medical

46.     For example, Dr. Anand made the following substantially identical observations

with regard to multiple patients she saw through Superior Medical:

  (a)   Patient appears to be stated age and is in no acute distress
  (b)   Patient is oriented times three
  (c)   Memory appears adequate
  (d)   Communication is adequate with no impairment of speech
  (e)   Skin is moist and perfumed, without cyanosis or jaundice
  (f)   Patient is able to dress and undress without difficulty
  (g)   Patient also had no difficulty getting on and off the examining table
  (h)   Patient sits comfortably for brief periods of time
  (i)   Patient transfers independently
  (j)   Patient ambulatory with a normal reciprocal gait

47.     Nevertheless, one or more MRI was recommended and/or conducted for all six

patients.

48.     Nerve block injections were prescribed for these patients.

49.     EDX testing was conducted, ordered and/or contemplated for these patients.

50.     Dr. Anand further offered an identical "professional opinion" as to all of these

patients, with identical assessments of their alleged disability:

(a)     Patient is partially disabled with marked disability of 75-99%

(b)     The prognosis of recovery is guarded.  [He/She] is partially disabled.
Physical activities such as lifting, carrying, bending, pulling, leaning,
prolonged periods of standing on feet or sitting, climbing stairs, etc., are
restricted.  Patient will need extensive follow-up therapy and/or possible
surgery to return [him/her] to a state prior to the accident....

### b.     Examinations Conducted Through Dr. Anand's Independent Practice

51.     Dr. Anand made the following substantially identical observations with regard to

multiple patients she saw through her independent practice:

(a)     Patient appears to be stated age and is in no acute distress
(b)     Patient is oriented times three
(c)     Memory appears adequate
(d)     Communication is adequate with no impairment of speech
(e)     Skin is moist and perfumed, without cyanosis or jaundice
(f)     Patient is able to dress and undress without difficulty
(g)     Patient also had no difficulty getting on and off the examining table
(h)     Patient sits comfortably for brief periods of time
(i)     Patient transfers independently
(j)     Patient ambulatory with a normal reciprocal gait

52.     Nevertheless, one or more MRI was conducted for all patients.

53.     EDX testing was conducted on all patients.

54.     Dr. Anand further offered an identical "professional opinion" as to all patients,

with identical assessments of their alleged disability:

(a)     Patient is partially disabled with marked disability of 75-99%

(b)     The prognosis of recovery is guarded.  [He/She] is partially disabled.
Physical activities such as lifting, carrying, bending, pulling, leaning,
prolonged periods of standing on feet or sitting, climbing stairs, etc., are
restricted.  Patient will need extensive follow-up therapy and/or possible
surgery to return [him/her] to a state prior to the accident....

c. **Examinations Conducted by Dr. Anand Through Physical Medicine and Rehab**

55. Dr. Anand made substantially identical observations with regard to multiple patients she saw through Physical Medicine and Rehab:

(a)     Patient is alert and oriented times three
(b)     Patient sits comfortably for brief periods of time
(c)     Patient transfers independently
(d)     Patient ambulates with normal reciprocal gait

56. Nevertheless, one or more MRI was conducted for the patients.

57. EDX testing was recommended and/or conducted for the patients.

58. Dr. Anand opined that the patients were either totally disabled or partially disabled to a degree of 75-99%.

2. **Excessive and Unnecessary Treatment and Services**

a. **Excessive and Unnecessary EDX Testing**

59. EMGs and NCVs ("EDX Tests") are purportedly performed and interpreted by Defendants because they are medically necessary to diagnose whether the insureds have radiculopathies or neurological conditions affecting the brainstem.

60. The American Association of Neuromuscular Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientifically based advancement of neuromuscular medicine, has adopted a Recommended Policy ("Recommended Policy") regarding the optimal use of electrodiagnostic medicine to diagnose various forms of neuropathies, including radiculopathies. The Recommended Policy accurately reflects the demonstrated utility of various forms of EDX Tests, and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

61.     As explained below, Defendants' pre-determined, uniform package of EDX Tests (including NCVs and EMGs) stands in marked contrast to the Recommended Policy and was established solely to maximize profits.

62.     While the Recommended Policy appropriately recognizes that NCVs and EMGs have demonstrated usefulness in diagnosing radiculopathies, it explains that the decision of which, if any, of these EDX Tests to perform should be individually tailored to address the unique circumstances of each patient.

63.     The Recommended Policy further states that the maximum number of NCVs and EMGs, which should be necessary to diagnose a radiculopathy in 90% of all patients is:

(a) NCVs of 3 motor nerves,

(b) NCVs of 2 sensory nerves,

(c) EMGs of 2 limbs and

(d) 2 H-Reflex studies.

64.     In marked contrast to the Recommended Policy, however, Defendants regularly perform a grossly excessive number of tests on the vast majority of Insureds, as follows:

(a) NCVs of 8 motor nerves (instead of the recommended 3);

(b) NCVs of 10 sensory nerves (instead of the recommended 2); and

(c) EMGs of 4 limbs (instead of the recommended 2).

65.     Instead of determining whether EDX testing is appropriate based on the unique circumstances of each individual patient, and tailoring the use of such tests accordingly, Defendants employ a cookie-cutter approach that results in the same excessive EDX tests being performed on virtually every Insured, without regard to medical necessity. Such pre-determined packages of EDX tests are designed solely for Defendants' financial gain.

### *(i)* *NCV Testing*

66.     NCVs are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with electrical currents. The velocity, amplitude and shape of the response are then recorded by electrodes attached to the surface of the skin, and are compared with well defined normal responses to identify the existence, nature, extent and specific location of any abnormalities in the sensory and motor nerve fibers of peripheral nerves in the arms and legs.

67.     There are several peripheral nerves in the arms and legs that can be tested with NCVs. Moreover, many of these peripheral nerves have both sensory and motor nerve fibers, either or both of which can be tested with NCVs. The decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers or both motor and sensory fibers in any such peripheral nerve should be tailored to each patient's unique circumstances. As a result, the nature and number of the peripheral nerves and the types of nerve fibers tested with NCVs should vary by patient.

68.     Superior did not tailor the NCVs to the unique circumstances of any Insured. Specifically, Superior performed the following NCVs on virtually every Insured, in excess of the Recommended Policy: 8 motor nerves in the arms and the legs, and 10 sensory nerves in the arms and the legs.

69.     Defendants' cookie-cutter approach was not based upon medical necessity, and the number of NCV studies conducted on each patient by Superior was grossly excessive. Superior's cookie-cutter approach with the NCVs was designed solely to maximize the charges that Defendants submit to State Farm.

70.     Specifically, if all other conditions of coverage are satisfied, the Fee Schedule permits lawfully licensed health care professionals to submit maximum charges of (a) $106.47

for each sensory nerve in any limb on which an NCV is performed; (b) $166.47 for each motor nerve (with F-wave) in any limb on which an NCV is performed, and (c) $119.99 for each HReflex test that is performed on the nerves of any limb. Superior performed all of the above described NCVs on virtually every Insured and generally submitted the maximum charges under the Fee Schedule for such EDX Tests solely to maximize the profits that Defendants could reap from each such Insured.

### (ii)    EMG Testing

71.    EMGs involve the insertion of a needle into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such muscle. The sound and appearance of the electrical activity in each muscle are compared with well-defined norms to identify the existence, nature, extent and specific location of any abnormalities in the muscles, peripheral nerves and nerve roots.

72.    There are many different muscles in the arms and legs, which can be tested with EMGs. The decision of how many limbs and which muscles to test in each limb should be tailored to each patient's unique circumstances. As a result, the number of limbs as well as the nature and number of the muscles tested through EMGs should vary by patient.

73.    Superior did not tailor the performance of EMGs to the unique circumstances of any Insured. Even assuming the EMGs were medically necessary, the nature and number of the EMGs by Superior regularly exceeded the maximum number of such tests that should be necessary in 90% (or more) of all patients with a suspected diagnosis of radiculopathy. Indeed, while the Recommended Policy states that the maximum number of EMGs which should be necessary for diagnosis is an EMG of 2 limbs, Superior regularly performed and billed for EMGs of 4 limbs.

74.     Aside from the Recommended Policy setting a maximum of EMGs of 2 limbs, it is extremely unusual for any patient to require an EMG of four limbs, yet Superior regularly performed and billed for 4-limb EMGs in cookie-cutter fashion. Superior did this not based upon medical necessity, but solely to maximize the charges that Defendants could submit to State Farm.

75.     Specifically, if all other conditions of coverage are satisfied, the Fee Schedule permits lawfully licensed health care professionals to submit maximum charges of (a) $185.73 if an EMG is performed on an adequate number of muscles (at least 5 muscles for suspected radiculopathy) per limb, (b) $241.50 if an EMG is performed on at least 5 muscles in each of two limbs, (c) $314.34 is an EMG is performed on at least 5 muscles in each of three limbs, and (d) $408.64 if an EMG is performed on at least 5 muscles in each of four limbs. Superior performed EMGs on the muscles of all four limbs for numerous insureds, in contradiction of the Recommended Policy.

### b.     Excessive and Unnecessary Nerve Block Injections

76.     The sympathetic nerves are part of the autonomic nervous system, which controls functions such as blood flow and temperature regulation to the arms and legs, sweating, heart rate, digestion, and blood pressure, which are not voluntarily controlled. Sympathetic Nerve Block Injections are primarily utilized for patients who have Reflex Sympathetic Dystrophy ("RSD"), Complex Regional Pain Syndrome and/or Vascular Insufficiency.

77.     Sympathetic Nerve Blocks are performed by injecting numbing medicine around the sympathetic nerves. Sympathetic Nerve Blocks should be performed by, medically directed by, or supervised by an anesthesiologist or a practitioner with specific training in sedation, anesthesia and rescue techniques.

78.     Superior generally billed State Farm $270 or $290 per Nerve Block Injection under the "Surgery" section of the NY Workers Compensation Fee Schedule (codes 64510 and 64520), with each treatment session for an insured involving billing for bilateral injections, two per side, for a total of four nerve blocks per patient per day, and a total bill for each session of $1,122.30.

79.     Superior's billing of four nerve blocks per patient per day included two injections in the cervical sympathetic nerves and two injections in the paravertebral sympathetic nerves. Upon information and belief, the Nerve Blocks were purportedly performed multiple times per week, for months on end, on many patients. Two examples of the large volume of Nerve Blocks being billed for include the following:

      (a)     on claim no. 32-V714-359, billing and treatment reports reveal that cervical or paraverterbral sympathetic nerve blocks were allegedly administered on 83 separate occasions.

      (b)     on claim no. 32-V745-581, billing and treatment reports reveal that cervical or paraverterbral sympathetic nerve blocks were allegedly administered on 75 separate occasions.

80.     Defendants' ordering and performing of Nerve Blocks was done without regard to medical necessity, and without any indication of patient need, and they were not individually tailored to address the unique circumstances of each patient. Instead, virtually every Insured received excessive Nerve Blocks in a cookie-cutter approach designed solely for Defendants' financial gain.

81.     Sympathetic Nerve Block injections should be performed in a surgical setting, with proper monitoring, including pulse oximeter, blood pressure monitoring, an oxygen supply, and immediate access to intravenous line placement and fluid.

82. It is standard practice in the medical field for Sympathetic Nerve Blocks to be performed under flouroscopic guidance and only by a trained physician as these injections can cause potentially dangerous side effects, such as interrupting the electrical innervations to the heart causing heart block and even a significant risk of death if not done properly. Complications that may result from this type of Nerve Block procedure include immediate onset of seizures, vocal cord paralysis, infection, hypotension and nerve damage.

83. Sympathetic Nerve Blocks should not be used for long-term treatment. Moreover, Sympathetic Nerve Blocks injections should never be done bilaterally.

84. Failure to adhere to the above described requirements relating to the performance of Sympathetic Nerve Blocks is a deviation from the medically accepted standard of care and causes serious risk to patient safety.

85. In contravention of the medically accepted standard of care, Dr. Anand does not have the necessary training, practice, license or board certification to perform, supervise or monitor the Nerve Blocks purportedly provided under the Superior Medical name.

86. In contravention of the medically accepted standard of care, the Nerve Blocks billed by Superior Medical to State Farm were performed by a physician's assistant without the experience or expertise to perform such Nerve Blocks and without any appropriate direction or supervision by an anesthesiologist or a practitioner with specific training in sedation, anesthesia and rescue techniques.

87. In contravention of the medically accepted standard of care, the Nerve Blocks billed by Superior Medical to State Farm were not performed in a surgical setting, were not performed under flouroscopic guidance, and were not performed with proper monitoring,

including pulse oximeter, blood pressure monitoring, an oxygen supply, and immediate access to intravenous line placement and fluid.

88.     In contravention of the medically accepted standard of care, the Nerve Blocks billed by Superior Medical to State Farm were not limited to patients diagnosed with RSD, Complex Regional Pain Syndrome and/or Vascular Insufficiency, but were performed on virtually any patient regardless of medically necessity or patient safety.

89.     In contravention of the medically accepted standard of care, the Nerve Blocks billed by Superior Medical to State Farm were regularly used for long-term treatment, and were regularly done bilaterally.

90.     Defendants' performance of Sympathetic Nerve Blocks caused significant risk to patient safety, including risk of seizures, vocal cord paralysis, infection, hypotension, nerve damage, and even death.

91.     Moreover, the ordering and performing by Defendants of Sympathetic Nerve Blocks was excessive and was done pursuant to a fraudulent, pre-determined protocol which was designed by the Defendants solely to maximize the potential charges that they could submit, and cause to be submitted, to State Farm.

92.     To the extent that Defendants did not actually perform the Sympathetic Nerve Blocks, but performed some other procedure, akin to trigger point injections or no procedure at all, the charges for the purported Nerve Block injections were billed under the "Surgery" section of the NY Workers Compensation Fee Schedule and were fraudulent, designed to mislead, and were exaggerated and excessive.

## C.   THE FRAUDULENT NF-3 FORMS SUBMITTED TO STATE FARM

93.   To support charges for the fraudulent services, Defendants have consistently submitted to State Farm statutorily prescribed claim forms for No-Fault Benefits (i.e. the NF-3 Form) since September 17, 2007 seeking payment for services for which they are ineligible to receive payment.

94.   In submitting such forms, Defendants have knowingly and repeatedly made false and misleading misrepresentations and/or omissions.  For example,

> (a)   Through the NF-3 forms, Defendants knowingly misrepresented to State Farm that services provided by Superior Medical and/or Dr. Anand were medically necessary, and therefore, they were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, these services were not medically necessary, rendering Defendants ineligible to receive reimbursement for those services under the No-Fault Laws.

> (b)   Through the NF-3 forms, Defendants knowingly misrepresented to State Farm the level and nature of services provided, in order to mislead State Farm into paying for such services.  Defendants' bills misrepresented and exaggerated the level of services provided to inflate the charges.

## IV.   DEFENDANTS' FAILURE TO COMPLY WITH STATE FARM'S REQUESTS FOR ADDITIONAL VERIFICATION

95.   As set forth above, the No-Fault Law and regulations require healthcare providers that seek payment of No-Fault Benefits to provide insurers with additional verification in order to establish their proof of claim, when duly requested, including all information that is necessary for an insurer to determine whether the claim submitted by the healthcare provider is payable.

96.   The issues for which additional verification is properly sought are not limited, and may include, for example, whether the services provided were actually rendered and/or

medically necessary; whether the professional corporation is ineligible for benefits pursuant to 11 N.Y.C.R.R. § 65- 3.16(a)(12) because it was fraudulently incorporated and owned and controlled by persons other than a licensed physician; and/or whether the services were provided by persons not employed by the provider, thus rendering the professional corporation ineligible to bill for No Fault benefits pursuant to 11 NYCRR §65-3.11(a).

97.     As patterns began to emerge in the bills Defendants were submitting to State Farm, State Farm made formal requests for additional verification from Superior Medical and Dr. Anand, including requests for EUOs.  These requests were made in accordance with the insurance policies under which the claims were submitted and pursuant to the No-Fault law and regulations.

98.     State Farm had, and continues to have, a good faith basis to seek additional verification, including EUOs from Defendants on the respective claims, in accordance with the No- Fault law and regulations.  As set forth in State Farm's correspondence to Defendants, EUOs were requested in an effort to obtain information regarding the questionable pattern in the health services and procedures allegedly being performed, the medical necessity of those services and charges, and whether Superior Medical was operating in compliance with governing laws and regulations and thus eligible for reimbursement under New York's No-Fault laws.

99.     In addition to the serious concerns regarding the Fraudulent Services, State Farm has serious concerns that the provision of health services by Superior is improperly subjected to the control and pecuniary interests of non-physicians in violation of New York State law. Indeed, Superior and Dr. Anand are associated with AMSAC (a.k.a. Amsac Healthcare Industry Consultants, Inc.), a billing and/or management company.

100. While the mere association with a management company or billing company does not mean that a medical PC is improperly owned by non-physicians and illegally operating, here there are serious concerns that Superior is controlled by non-medical professionals engaged in a corporate practice of medicine scheme because (a) the pattern and volume of health services allegedly being rendered is far outside the boundaries of reasonable care and (b) Dr. Anand and Superior seem to be part of a revolving door of "papers owners" associated with the suspect clinics that operated in Brooklyn and Queens – all involving a scheme by the non-physicians to use illegally incorporated professional medical corporations to profit unlawfully from the provision of health care services in violation of law.

101. Each request by State Farm for an EUO and additional verification was timely made and based upon the application of objective standards justifying the EUO and information/documentation sought.

102. Each request by State Farm for an EUO and additional verification endeavored to select places and times for the EUO that would be convenient to Superior. Each request advised Superior that State Farm would provide reimbursement for any loss of earnings and reasonable transportation expenses incurred in complying with the request.

103. Superior and Dr. Anand systematically failed and/or refused to appear for any EUO.

104. Superior's systemic failure and/or refusal to appear for an EUO constitutes a material breach of State Farm's policies and the No-Fault Laws and, as such, relieve State Farm from any obligation to pay the claimants on any of the claims.

105. In each instance where Superior refused to appear for an EUO, State Farm issued a timely denial on the prescribed NF-10 form stating in relevant part that the claimant failed to comply with its obligation to present a proper proof of claim by failing to provide the EUO, and that the claim was denied because it failed to satisfy a condition of coverage.

106. As such, Superior is not entitled to reimbursement for any bills which it has submitted to State Farm and which State Farm has timely denied based on Superior's failure to appear for timely scheduled EUOs, which constitutes a failure by Defendants to meet a condition precedent to coverage under 11 N.Y.C.R.R. § 65-1.1(d) and violation of the No Fault regulations.

## V. DEFENDANTS' FRAUDULENT CONCEALMENT AND STATE FARM'S REASONABLE RELIANCE

107. Defendants were legally and ethically obligated to act honestly and with integrity in connection with the performance of the healthcare services and the submission of charges to State Farm.

108. To induce State Farm to pay the fraudulent charges for the healthcare services allegedly provided, Defendants systemically have concealed their fraud and have gone to great lengths to accomplish this concealment.

109. Defendants have consistently failed and refused to appear for properly noticed EUOs and, in so doing, have knowingly and intentionally concealed material facts from State Farm and have obstructed State Farm's efforts to obtain additional facts that would demonstrate that a significant number of the healthcare services at issue were medically unnecessary and performed pursuant to a fraudulent predetermined protocol designed to maximize the charges that could be submitted, and/or that Superior Medical's bills misrepresented and exaggerated the level of services provided.

110.    The facially-valid documents submitted to State Farm in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause State Farm to rely upon them. As a result, State Farm has incurred damages of approximately $157,000 based upon the fraudulent charges representing payments made by State Farm to Superior since September, 2007.

111.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from State Farm, State Farm did not discover and could not reasonably have discovered that its damages were attributable to fraud until after numerous claims were paid.

## COUNT ONE
### Against All Defendants
### (Declaratory Relief Under 28 U.S.C. §§ 2201 and 2202)

112.    State Farm incorporates by reference the allegations set forth in Paragraphs 1 through 111 of this Complaint, as though fully set forth herein.

113.    There is an actual case or controversy between State Farm and Defendants regarding more than Six Hundred Thousand Dollars ($600,000) in fraudulent billing for healthcare services that has been submitted to State Farm.

114.    Defendants contend that they are entitled to No Fault Benefits from State Farm.

115.    State Farm had, and continues to have, a good faith basis to seek an EUO of Defendants based on the facts and circumstances surrounding Defendants, the claims and bills submitted to State Farm, and the services allegedly provided by Defendants.

116.    Defendants have no right to receive payment for any of the claims that State Farm has timely denied as a result of Defendants' failure to appear for an EUO, because Defendants' failure to appear constitutes a breach of coverage conditions and a violation of Defendants' obligations under applicable No-Fault laws.

NYC 420145.1                                    27

117.    Defendants are not entitled to payment for the claims at issue for the additional reason (discussed more fully above) that Defendants have billed State Farm for services that were excessive, not medically necessary, and performed (if at all) pursuant to fraudulent, cookie-cutter procedures.

118.    Accordingly, pursuant to 28 U.S.C. §§ 2201 and 2202, State Farm requests a Declaratory Judgment with respect to such claims, confirming that:

(a)     Superior's failure to appear at any duly scheduled EUO requested by State Farm constitutes a failure by Superior to meet a condition precedent to coverage and violates Superior's obligations under New York's No-Fault regulations; and

(b)     State Farm is not legally obligated to pay Superior on claims totaling more than Six Hundred Thousand Dollars ($600,000) where it duly demanded an EUO.

### COUNT TWO
### Against All Defendants
### (Common Law Fraud)

119.    State Farm incorporates by reference the allegations set forth in Paragraphs 1 through 111 of this Complaint, as though fully set forth herein.

120.    Defendants intentionally and knowingly made false and fraudulent statements of material fact to State Farm and concealed material facts from State Farm in the course of their submission of fraudulent bills seeking payment for healthcare services.

121.    The false and fraudulent statements of material fact include, without limitation:

(a)     misrepresentations that the services provided by Superior were medically necessary when, in fact, they were not;

(b)     misrepresentations that Superior's bills properly and fairly reported the nature and level of services provided without exaggeration; and

(c)     misrepresentations that Superior's health care services were provided based on the exercise of independent medical judgment, rather than based

on purely financial interests and/or the improper pecuniary interest of non-professionals.

122.    Defendants knowingly and intentionally made these material misrepresentations and concealed material facts in a calculated effort to induce State Farm to pay charges submitted by Defendants that were not compensable under the No-Fault Laws.

123.    State Farm reasonably relied on Defendants' false and fraudulent representations, and as a proximate result has incurred damages of approximately One Hundred Fifty Seven Thousand Dollars ($157,000) based upon the fraudulent charges.

124.    Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles State Farm to recover punitive damages.

## COUNT THREE
### Against All Defendants
### (Unjust Enrichment)

125.    State Farm incorporates by reference the allegations set forth in Paragraphs 1 through 111 of this Complaint, as though fully set forth herein.

126.    As set forth above, Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of State Farm.

127.    When State Farm paid the bills and charges submitted by or on behalf of Superior for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

128.    Defendants have been enriched at State Farm's expense by State Farm's payments which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

129.    Defendants' retention of State Farm's payments violates fundamental principles of justice, equity and good conscience.

130.    By reason of the above, Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $157,000.

**WHEREFORE**, Plaintiff State Farm Mutual Automobile Insurance Company respectfully requests that a Judgment be entered in its favor and against the Defendants, as follows:

1.     On Count One, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Defendants have no right to receive payment for any pending bills submitted to State Farm where they have refused and/or failed to appear for a duly scheduled examination under oath;

2.     On Count Two, compensatory damages in favor of State Farm in an amount to be determined at trial, but not less than $157,000, together with punitive damages, interest and costs;

3.     On Count Three, compensatory damages in favor of State Farm in an amount to be determined at trial, but not less than $157,000, together with punitive damages, interest and costs; and

4.      Such other and further relief as this Court deems just and proper.

Dated:      New York, NY
            May 4, 2012

                                        Ira G. Greenberg (IG-6156)
                                        EDWARDS WILDMAN PALMER LLP
                                        750 Lexington Avenue, 8th Floor
                                        New York, NY 10022
                                        (212) 308-4411
                                        igreenberg@edwardswildman.com

                                        Todd A. Noteboom
                                        (subject to *pro hac vice* admission)
                                        Monica L. Davies
                                        (subject to *pro hac vice* admission)
                                        LEONARD, STREET AND DEINARD
                                         Professional Association
                                        150 South Fifth Street, Suite 2300
                                        Minneapolis, MN 55402
                                        (612) 335-1500
                                        todd.noteboom@leonard.com
                                        monica.davies@leonard.com

                                        *Attorneys for Plaintiff*